IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of | No. 85816-5-I |
| | DIVISION ONE |
| H.A.W. | UNPUBLISHED OPINION |

SMITH, C.J. — H.A.W.'s mother appeals the trial court's order that found the child dependent under RCW 13.34.030(6)(c). She also appeals a disposition order concerning the child's out-of-home placement. The child's father did not appeal either order. The mother asserts that insufficient evidence is in the record to support the finding of dependency. She further contends that no clear, cogent, and convincing evidence of a manifest danger is in the record to support the child's out-of-home placement. Substantial evidence supports the finding that H.A.W. had no parent capable of adequately caring for them such that H.A.W. was in circumstances constituting a danger of substantial damage to their psychological or physical development. The mother also fails to show that the trial court abused its discretion in its placement decision. Therefore, we affirm.

FACTS

H.A.W. was born on January 14, 2023. At the time of birth, both of H.A.W.'s parents suffered from a fentanyl addiction. The mother used fentanyl throughout her pregnancy and, as a result, exposed H.A.W. to fentanyl. Shortly after birth, H.A.W. exhibited symptoms of neonatal abstinence syndrome, and

scored high on the scale for opioid withdrawal. In the days immediately following, H.A.W.'s symptoms of opiate withdrawal worsened and the infant developed a high fever, causing concern of a possible infection, seizures, or even death.

H.A.W. was placed on an administrative hold because of their worsening condition and some concerning behavior exhibited by the parents. On January 18, 2023, the Department of Children, Youth, and Families (DCYF) initiated a dependency petition asking the court to find H.A.W. dependent under RCW 13.34.030(6)(b) and (c). The parents subsequently agreed to a shelter care order placing the child at the Pediatric Interim Care Center upon their release from the hospital and thereafter with a relative of the mother once medically ready.

Both parents continued to use fentanyl after H.A.W.'s birth. In March 2023, the parents began a course of intensive outpatient drug treatment (IOP) at Therapeutic Health Services (THS). As part of this program, both parents engaged in regular IOP counseling and received daily doses of methadone. In addition, the mother was engaged in mental health counseling through THS. Both parents have consistently engaged in their counseling sessions and consistently received their daily methadone dosing. The mother's last reported date that she used fentanyl was in either March or April of 2023. The father's last reported date of use was May 10, 2023.

To monitor their progress and compliance with their drug treatment programs, DCYF referred the parents to random urinalysis (UA) testing. Before

trial, the mother completed about four UAs. All of the UAs tested positive for norfentanyl, a metabolite of fentanyl. According to Dr. Aaron Brown, a positive test for norfentanyl could be explained either as a residual result from previous use or from exposure within the previous 24 hours.

Because the mother was continuing to test positive for norfentanyl, her treatment provider at THS deemed her to be not in compliance with treatment. Only after the mother completed 90 days of negative UAs would she be permitted to move on to the next step in the treatment program. To be considered in long-term recovery, the mother would need to be "sober and recovering substance free" for a period of at least six to seven months.

The dependency trial took place over six days, beginning on July 20, 2023. Both DCYF and the child's guardian ad litem (GAL) urged the court to find H.A.W. dependent, while both parents opposed dependency. Both parents testified at trial, as did the three DCYF agents who worked with the parents, the pediatrician who attended to H.A.W. after their birth, a substance abuse counselor and the clinical supervisor at THS, the mother's mental health provider, the child's GAL, the visit supervisor, and the scientific director at the facility that performed the drug testing on the parents' UAs.

At trial, both parents were asked about the dangers posed by fentanyl. The father testified that fentanyl is "bad for the heart, bad for the liver, kidneys, the lungs" and that "if you're not used to the substance, just touching it can overdose you." He recognized that the risk posed by fentanyl was far greater to

children, as even touching or breathing fentanyl would "do very serious harm to a child, such as death."

In contrast, the mother did not accurately understand the risks of fentanyl use.[1] The mother testified that she believed that the risk to children was precisely the same as the risk to an adult user, and that those risks consisted of liver damage and withdrawal symptoms. The mother also believed that using fentanyl did not affect her ability to safely parent H.A.W. and that she could be a safe parent even while under the influence. The mother believed that the same was true for the father, testifying that even "when we were using he still did not pose a threat." Furthermore, the mother testified that substance abuse treatment did not have a positive impact on her life.

At the close of trial, the trial court articulated its oral findings, which it later incorporated by reference into its dependency order. On the positive side, the court noted that the parents were visiting the child "as much as possible" and the visits "have been outstanding." The court noted that, aside from the UA results, both parents were compliant with their treatment plans and testified that they were committed to continuing. But the trial court also noted that both parents

---

[1] The mother asserts in her brief that the trial court found that she "seems to 'get it' regarding the potential risks of her substance abuse for her child." This is not an accurate summary of the trial court's finding. Rather, the trial court stated:

> [W]hile there's some statements that were made, it's difficult at the start of treatment that may have made it appear that [the mother] was not in it for the long haul. She didn't acknowledge a problem, didn't acknowledge the negative effects at the start. It seems like the records presented and through testimony here that [the mother] gets it. She does what she's supposed to do in the IOP program and with the meetings . . . that are provided.

had not "sufficiently addressed" their substance use, as neither was fully compliant with their treatment plan given that neither had yet received a negative UA result. The trial court also found it concerning that the mother did not have a clear understanding of the impact of fentanyl use on her ability to parent or of the severity of the risk fentanyl posed to children. Based on its findings concerning the parents' substance abuse and their early stage of treatment, the trial court found that H.A.W. had no parent capable of adequately caring for them, "such that [they are] still in circumstances which would constitute a danger of substantial damage to [their] psychological or physical development." Accordingly, the trial court found H.A.W. to be dependent under RCW 13.34.030(6)(c).

At the subsequent disposition hearing, the trial court ordered that the child remain in the custody of their current caregiver. The trial court ordered the mother to continue following the recommendations of her providers at THS, provide negative UAs for a 90-day period, attend an in home evidence-based parenting program, and submit to a psychological evaluation.[2]

The mother appeals.

ANALYSIS

Parents have a fundamental liberty interest to the care, custody, and companionship of their minor children. *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). But the State has an interest in protecting

---

[2] With the exception of the psychological evaluation, the trial court ordered the father to adhere to the same requirements.

the physical and mental health of children, and "when a child's physical or mental health is seriously jeopardized by parental deficiencies, 'the State has a parens patriae right and responsibility to intervene to protect the child.' " *Schermer* 161 Wn.2d at 941 (quoting *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)).  Dependency allows state intervention to remedy family problems and provide needed services.  *Schermer*, 161 Wn.2d at 942.  Unlike a proceeding to terminate parental rights, dependency is a preliminary and remedial process that does not permanently deprive a parent of any rights.  *Schermer*, 161 Wn.2d at 943.

Dependency

The mother first asserts that the finding of dependency was not supported by sufficient evidence.  This court will uphold the trial court's factual findings if supported by substantial evidence.  *In re Dependency of M.P.*, 76 Wn. App. 87, 90, 882 P.2d 1180 (1994).  Substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party below (here, DCYF), a rational trier of fact could find the fact more likely than not to be true.  *M.P.*, 76 Wn. App. at 90-91.  This court may not reweigh evidence or disturb the trial court's credibility determinations.  *M.P.*, 76 Wn. App. at 91.

To establish H.A.W.'s dependency, DCYF had to prove by a preponderance of the evidence that the child meets one of the statutory definitions of dependent child as set forth in RCW 13.34.030(6).  RCW 13.34.110(1).  The trial court found H.A.W. dependent under RCW 13.34.030(6)(c), which defines a dependent child as "any child who ... [h]as

6

no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." A finding of actual abuse or neglect is not necessary to find a child dependent under subsection (6)(c); the danger of harm is sufficient. *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013). Nor is it necessary for the court to find the parents "unfit." *Schermer*, 161 Wn.2d at 944. "Rather, [RCW 13.34.030(5)(c)[3]] allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs." *Schermer*, 161 Wn.2d at 944. The trial court "has broad discretion in evaluating all of the evidence before it" and " 'considerable flexibility to receive and evaluate all relevant evidence in reaching a decision that recognizes both the welfare of the child and parental rights.' " *Schermer* at 952 (quoting *In re Welfare of Becker*, 87 Wn.2d 470, 477-78, 553 P.2d 1339 (1976)).

The mother challenges the trial court's findings that the parents' substance abuse had not been sufficiently addressed as per the GAL[4] and that it would be necessary to have increased compliance with treatment, including negative urinalysis testing. Both of these findings were supported by ample evidence.

Virginia Whalen, H.A.W.'s GAL, testified that she "would be concerned for [H.A.W.]'s safety if there was no continued court oversight." As the GAL noted,

---

[3] RCW 13.34.030(5)(c) was later renumbered RCW 13.34.030(6)(c). *See* Laws of 2009, ch. 520 § 21.

[4] The mother challenges this finding as it appeared both in the trial court's oral findings and in its written order. For purposes of our analysis, we treat this as one finding.

both parents "have very lengthy histories of substance misuse and that is challenging to overcome. And they are working on overcoming that but I think it would be premature to say that they are now at a spot where they would have long-term sobriety." The GAL further testified that because H.A.W. was "a very vulnerable, nonverbal infant who needs all of [their] everyday needs met by [their] parents . . . I'd like to see [H.A.W.'s] parents to be a little bit further along in their journey to sobriety and also demonstrate their ability to meet all of [H.A.W.'s] needs consistently at visits before reunification." The trial court found this testimony compelling.

The GAL was not the only witness to testify that the parents were not yet to a point of long-term sobriety. The mother's substance abuse counselor Alejandra Grillo testified that she generally considers a patient to be maintaining sobriety "probably after 6, 7 months being sober and recovering substance free." At the time of trial, the mother testified that she had only been sober for about three to four months. Grillo further testified that the mother was not compliant with the treatment program because she was continuing to have positive UA results, and only once she completes 90 days of negative UAs could she move on to the next phase of treatment.

DCYF employee Taide Torres, the social worker assigned to the parents' case since April 2023, also testified that she did not believe that the mother was currently capable of meeting H.A.W.'s needs without court oversight because there were further steps she and the father to take "towards decreasing or

diminishing their substance use" to be able to reach the point that they could independently care for H.A.W.

The mother nevertheless asserts that drug addiction alone cannot support a finding of dependency. The mother primarily relies upon *In re Dependency of A.M.M.*, 182 Wn. App. 776, 332 P.3d 500 (2014).[5] This case is inapposite for multiple reasons. First, *A.M.M.* concerned the termination of parental rights rather than a dependency. 182 Wn. App. at 779. As such, DCYF's burden of proof is significantly lower. *Compare* RCW 13.34.110(1) (petitioner must establish dependency by preponderance of the evidence) *with* RCW 13.34.190 (allegations in termination petition must be proved by clear, cogent, and convincing evidence). Second, *A.M.M.* concerned a due process challenge made by the mother to the trial court's finding that she lacked knowledge of her children's developmental needs, as the State had never asserted that it was seeking termination on that basis. 182 Wn. App. at 791-92. Nowhere did this court state that drug addiction could not be the sole basis for a dependency; rather, this court held that the trial court could not order termination on a basis not articulated in the State's petition. *A.M.M.*, 182 Wn. App. 792. Because this case is not a termination and the mother is not raising a due process challenge, *A.M.M.* is inapplicable.

Additionally, the trial court's finding of dependency here was not based solely on the fact that the mother had a drug addiction. As the father testified,

---

[5] The mother also relies upon a California case, *In re Rebecca C.*, 228 Cal. App. 4th 720, 175 Cal. Rptr. 3d 264 (2014). California law has no application here.

fentanyl is a dangerous substance that can cause the death of child through mere exposure. The mother, however, was unaware of this risk, believing that the only risk to a child was from the symptoms of withdrawal, and even believed that she could safely parent while actively using fentanyl. The trial court found this testimony "concerning." Furthermore, both parents admitted that they had prior failed attempts at sobriety. Even from the mother's own testimony, it was reasonable for the trial court to infer that the mother's substance abuse had not been sufficiently addressed such that she would be able to safely parent H.A.W.

When viewed as a whole, in the light most favorable to DCYF, the facts in this case support the trial court's finding that the mother was not capable of adequately caring for H.A.W. and that this inability posed a danger of substantial damage to the child's physical development.

<u>Placement</u>

The mother also challenges the trial court's dispositional ruling that placed H.A.W. in out-of-home care. A trial court's placement decision is discretionary and will not be overturned on appeal absent an abuse of discretion. *In re Dependency of A.C.*, 74 Wn. App. 271, 275, 873 P.2d 535 (1994). The "child's best interest is the paramount concern in placement decisions." *A.C.*, 74 Wn. App. at 277 (citing *In re Dependency of J.B.S.*, 123 Wn.2d 1, 8, 863 P.2d 1344 (1993)). A placement decision involves a "highly fact-specific inquiry that cannot be reduced to a mathematical equation." *J.B.S.*, 123 Wn.2d at 11. "Because a juvenile court must evaluate a considerable amount of information and weigh the credibility of numerous witnesses in order to balance the best interests of a child

against a parent's rights, we place 'very strong reliance' upon a trial court's determination of what course of action will be for the best interest of the child." *In re Dependency of T.L.G.*, 139 Wn. App. 1, 15, 156 P.3d 222 (2007) (quoting *In re Dependency of K.R.*, 128 Wn.2d 129, 147, 904 P.2d 1132 (1995)).

Relying on *In re Dependency of Z.A.*, 29 Wn. App. 2d 167, 540 P.3d 173 (2023), *overturned,* 3 Wn.3d 530 (2024), the mother asserts that DCYF failed to prove by clear, cogent, and convincing evidence that no parent or guardian was available to care for the child and that, accordingly, no substantial evidence exists to place the child in out-of-home care under Former RCW 13.34.130(6)(a) (2019)[6]. After the mother submitted her opening brief, the Supreme Court reversed this court's decision in *Z.A.* and held that the standard of proof for out-of-home placement under Former RCW 13.34.130(6)(a) (2019) is preponderance of the evidence, rather than clear, cogent and convincing evidence. *In re Dependency of Z.A.*, 3 Wn.3d 530, 536, 553 P.3d 1117 (2024). The mother does not address the Supreme Court's opinion in her reply, nor does she argue that the evidence was insufficient for out-of-home placement under the preponderance of the evidence standard. Because the mother appears to have abandoned this argument, we decline to consider it further.

<u>Mental Health Evaluation</u>

Finally, the mother asserts that the trial court abused its discretion by ordering her to undergo a mental health examination. This claim is now moot, as

---

[6] RCW 13.34.160 was modified by the legislature in 2024. Laws of 2024, ch. 328 § 104. Subsection (6)(a) was not altered as part of this modification.

the mother has undergone the ordered evaluation.  We do not consider moot issues unless they present "a matter of 'continuing and substantial public interest.' " *State v. Beaver*, 184 Wn. App. 235, 241, 336 P.3d 654 (2014) (quoting *State v. Hunley*, 175 Wn.2d 901, 907, 287 P.3d 584 (2012)).  "In determining whether a sufficient public interest is involved, we consider '(1) the public or private nature of the question presented; (2) the desirability of an authoritative determination which will provide future guidance to public officers; and (3) the likelihood that the question will recur.' " *Beaver,* 184 Wn. App. at 241 (quoting *In re Detention of Cross,* 99 Wn.2d 373, 377, 662 P.2d 828 (1983)).

The mother does not contend that her challenge to the trial court's order of a mental health evaluation presents an issue of continuing and substantial public interest.  Moreover, resolution of this issue is dependent on the facts particular to this case and would thus provide limited to no guidance in future cases.  Therefore, we decline to address this issue as moot.

Because the trial court's finding of dependency was supported by substantial evidence, we affirm.

Smith, C.J.

WE CONCUR:

Díaz, J.                                    Colburn, J.